[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 934 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 935 
The appellant was indicted and convicted of capital murder under those portions of the Alabama Death Penalty Statute prohibiting any murder committed by a defendant who has been convicted of murder in the first or second degree in the twenty years preceding the crime or any murder committed while the defendant is under a sentence of life imprisonment. Sections 13-11-1 through 9, Code of Alabama 1975. Punishment was fixed at death in the electric chair. Both at trial and on appeal the appellant is represented by court appointed counsel.
The facts reveal that Joe Lee Gilliland, the deceased, rented a room in a house trailer owned by Mrs. Mary Helen Leonard. Mrs. Leonard and her two sons also lived in the trailer. Mrs. Leonard, Gilliland, and the appellant were old acquaintances, and on the day before the shooting, which occurred on November 22, 1976, the appellant and Gilliland had been drinking together in the trailer.
On the evening of the shooting, Mrs. Leonard had been with the appellant at a local "beer joint" and had asked him to drive her home because someone had borrowed her automobile. Mrs. Leonard and the appellant arrived at her trailer in the appellant's car and went inside where Mrs. Leonard's two sons were watching television. Gilliland was in his room lying in bed. No one else was in the trailer. Mrs. Leonard left the appellant in her dining room while she went to her bedroom to use the bathroom and put on her house shoes. While Mrs. Leonard was in the bedroom and her sons were watching television a shot was heard.
Mitchell Leonard, Mrs. Leonard's sixteen year old son, ran to Gilliland's room and discovered that Gilliland had been shot in his bed. Anthony Crooms, Mrs. Leonard's youngest son, ran out the front door of the trailer to get his sister and her husband who lived next door. Anthony saw the appellant run across the yard and leave in his automobile.
No one had seen the appellant enter Gilliland's room, shoot him or exit the trailer. After the shooting, the appellant was not to be found in Mobile, Alabama. Expert testimony attributed the cause of Gilliland's death as being a gunshot wound with massive injury to the brain and massive hemorrhage.
In December of 1976 the appellant was arrested at his mother's home in Decatur, Alabama. Upon his arrest, the appellant identified himself as Joe Gilliland and produced a temporary driver's license and a Red Lounge membership card issued to Joe Gilliland. These were the only items of identification contained in the appellant's wallet.
The Assistant Chief of Police for LaGrange, Georgia, testified that this very same appellant had received a life sentence for murder in Georgia in 1969.
Immediately after the state rested its case, the defense rested without interposing any motion or objection to test the sufficiency of the evidence against the appellant. The attorneys presented their closing arguments to the jury, the trial judge charged the jury, and after due deliberation, the jury found the appellant guilty as charged in the indictment. *Page 936 
The following day a hearing was held on the aggravating and mitigating circumstances as required by statute to determine whether the trial judge would sentence the appellant to death or to life imprisonment without parole. At the conclusion of the hearing the court made formal findings of fact. The trial judge found that there were "absolutely no mitigating circumstances" and that "the aggravated circumstances are overwhelming". Particularly, the court found that on May 14, 1969, the appellant was convicted in the Superior Court of Troop County, Georgia, of murder, with a verdict of guilty — recommendation of mercy, with a sentence of life during his natural life; that on March 11, 1977, the appellant was convicted of robbery in the Circuit Court of Morgan County, Alabama, and given a sentence of twenty years in the penitentiary[1]; that on February 24, 1976, the appellant was sentenced to life in the Mississippi State Prison on a charge of armed robbery, the sentence to run consecutively with the appellant's life sentence in Georgia; and that a 1964 charge of second degree murder against the appellant had been nol prossed. The court also found that the appellant had a "long, significant history of prior criminal activity". In its findings of fact the trial judge also stated that
 "(t)he circumstantial evidence was rather overwhelming that Mr. Joe Gilliland was killed while he apparently was flat on his back in bed in his underclothes for no apparent reason. . . . The Court felt that the killing was about as senseless an act or uncalled for act as it has tried at anytime."
 I
The appellant initially argued that the Alabama Death Penalty Statute is unconstitutional because a mandatory death penalty upon a finding of guilt without any consideration of aggravating or mitigating circumstances (by the jury) violates the Eighth and Fourteenth Amendments to the Constitution of the United States; because the post-jury verdict process violates due process by requiring the defendant, who is sentenced to die, to prove to the court why he should not die; and because the appellate review provided in the death penalty statute is inadequate to comply with constitutional demands.
Each of these arguments has been previously disposed of by this court and the constitutionality of the Alabama Death Penalty Statute upheld initially in Jacobs v. State,361 So.2d 607 (Ala.Cr.App., 1977) and subsequently affirmed in Jacobs v.State, 371 So.2d 429 (Ala.Cr.App., remanded for further proceedings, 1977) and Ritter and Evans, III v. State,361 So.2d 654 (Ala.Cr.App., 1977); and Cook v. State,369 So.2d 1243 (Ala.Cr.App., 1977). Since the appellant has raised no new or additional reason for invalidating the death penalty which we have not previously considered, we hereby reaffirm the constitutional soundness of that statute.
 II
The appellant contends that the trial court erred to a reversal in excusing a juror for cause contrary to the admonition of the Alabama Supreme Court in Liddell v. State,287 Ala. 299, 251 So.2d 601 (1971), that, in a capital case, a juror cannot properly be excused for cause solely upon his answer that he has a fixed opinion ("conscientious scruples", "opposition") to capital punishment. Witherspoon v. Illinois,391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); Boulden v.Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969);Howard v. State, 287 Ala. 435, 252 So.2d 304 (1971); Jackson v.State, 285 Ala. 564, 234 So.2d 579 (1970). A prospective juror may be excused for cause where he has been examined by the trial judge and a determination made that the juror's feelings as to capital punishment are sufficiently strong so that he would automatically refuse to impose a death sentence regardless of the evidence produced at trial *Page 937 
and despite of the instructions of the trial court.Witherspoon, 391 U.S. at 522, 88 S.Ct. at 1777. In accordance with the general law that allows a juror who is not impartial to be challenged for cause, a prospective juror may properly be excused for cause where his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt. Witherspoon, 391 U.S. 522, n. 21, 88 S.Ct. 1770.[2]
A person who has a "fixed opinion against" or who does not "believe in" capital punishment might nevertheless be perfectly able as a juror to abide by the existing law and follow conscientiously the instructions of a trial judge and consider fairly the imposition of the death sentence in a particular case. Boulden, supra; Maxwell v. Bishop, 398 U.S. 262,90 S.Ct. 1578, 26 L.Ed.2d 221. Thus when a juror indicates his beliefs against, scruples, or aversions to the death penalty, it becomes incumbent upon the trial court to ascertain whether the juror, notwithstanding his beliefs or scruples, would be able to impartially consider the issues with respect to the defendant's guilt, and, after having determined the defendant's guilt, be able to consider all the penalties provided by law, including the death penalty.
In determining whether a prospective juror should have been disqualified from a capital case because of his opposition to capital punishment, the critical question for the reviewing court is not how the phrases employed in this area have been construed by the courts and commentators, but how they might be understood — or misunderstood — by prospective jurors.Boulden, supra. Whether a juror evidences absolute opposition to the death penalty so as to be excludable for cause underWitherspoon is a difficult question subject to seemingly inconsistent results on similar facts. Annotation: Beliefs regarding capital punishment as disqualifying juror in capital case — post-Witherspoon cases, 39 A.L.R.3d 550.
Five jurors were challenged for cause by the state and excused because of their opinions on capital punishment. The trial court began its qualification of the veniremen on capital punishment with the following question:
 "Is there any juror who has a fixed and an abiding conviction against a legal punishment of death by electrocution? Those of you in Panel 1 who have such a fixed and abiding against a legal punishment of death by electrocution, please stand."
Defense counsel objected to this question and after overruling the objection the court continued to question the veniremen.
 "Did anyone in Panel 1 state that you had a fixed and abiding conviction against a legal punishment of death by electrocution that would prevent you from imposing a guilty verdict in this case — which is the only verdict you can return of guilt? You can return a verdict of Not Guilty; or you can return a verdict of Guilty, and if you do return a verdict of Guilty the statute provides that you must fix the punishment at death. (No response.) Does anyone in Panel 2 have a fixed and abiding conviction against fixing a punishment at death by electrocution in such a case as this? (Juror stood.) What is your full name, m'am?
"JUROR: Donna Fulmer Keaton.
 "THE COURT: The statute provides that you will fix the death penalty if you find that Mr. Wilson did unlawfully, intentionally, and with malice aforethought, kill Joe Lee Gilliland; that constitutes what we normally consider the elements of First Degree Murder. If the State proves that, and also in addition to that *Page 938 
proves that Mr. Wilson was under a sentence of life imprisonment prior to this, would you have a fixed opinion against imposing the death penalty? (No response.) Just give us your best judgment — yes or no.
"JUROR KEATON: Yes."
The state then objected for cause, and the trial judge excused this juror over defense counsel's objection.
After similar questioning, the trial judge excused a second juror.
 "THE COURT: Does any other juror in Panel 2 at this time have a fixed and abiding conviction against fixing the death penalty at death by electrocution if they find that this was a First Degree Murder committed after Mr. Wilson had previously been sentenced to life imprisonment? (No response.) In Panel 3? (Juror stood.) All right, sir; give us your full name.
"JUROR: Thomas Joseph Beckham.
 "THE COURT: Mr. Beckham, you have a fixed opinion that under no circumstance would you sign any guilty verdict which would require the fixing of the death penalty?
"JUROR BECKHAM: I do."
A third juror was also excused for cause.
 "THE COURT: Does any juror in Panel 4 have a fixed and abiding conviction against fixing the punishment at death by electrocution? (Juror stood.) Are you Mrs. Hobart?
"JUROR: Yes.
 "THE COURT: If you found that the offense was Murder in the First Degree, and if you also found that Mr. Wilson had previously been sentenced to life imprisonment, would you have an abiding conviction against a verdict of guilty if it required the death penalty?
"JUROR HOBART: I would have mixed emotions about it.
 "THE COURT: In your best judgment, yes you would, or no you wouldn't?
"JUROR HOBART: Right.
"THE COURT: Well, what are you telling us; are you —
"JUROR HOBART: Really, I don't believe in it.
 "THE COURT: You do feel like you have a fixed opinion against it?
"JUROR HOBART: Yes."
A fourth prospective juror was excused for cause.
 "THE COURT: Does any juror in Panel 5 have a fixed opinion against a legal punishment — finding a Defendant guilty and fixing his punishment at death by electrocution? (Juror stood.) What is your full name, m'am?
"JUROR: Yes, Betty Miller Brunson.
 "THE COURT: Mrs. Brunson, you would have a fixed opinion against finding a verdict of guilty if you felt that it required the death penalty?
"JUROR BRUNSON: I don't believe I could say Kill Him.
 "THE COURT: You feel that you do have a conviction against it?
"JUROR BRUNSON: Yes."
Finally, a fifth juror was excused for cause.
 "THE COURT: Marshall Gunn in Panel 5; Mr. Gunn, do you have a fixed opinion against returning a verdict of guilty which required the fixing of the death penalty?
"JUROR GUNN: Yes, sir."
Additionally the trial judge questioned the five excused jurors as a group.
 "THE COURT: Now, what the Court intended to ask you is, after hearing all of the evidence in the case, if you were required to return a verdict of guilty, which would automatically fix his punishment at death, the Court has asked you now if you have an abiding conviction against assessing such a verdict? I believe that five of you have responded that you would; those five, is that the way you understood the question?
(The five said jurors nodded in the affirmative.)"
We have carefully examined the questions propounded to these five prospective jurors. In addition to being asked whether or not they were opposed to capital *Page 939 
punishment each of the five jurors was also asked a question that elicited a reply indicating that under no circumstances would he vote in favor of the death sentence regardless of the evidence in the case. Although the questions put to these jurors were not expressed in the most articulate or exact language, we find that the trial court made it unmistakably clear to these prospective jurors that only such jurors who could not or would not impose the death penalty under any circumstances would be excused for cause. "The test ofWitherspoon is not to be applied with the hypertechnical and archaic approach of a 19th Century pleading book, but with realism and rationality." State v. Avery, 286 N.C. 459,212 S.E.2d 142 (1975). There is no requirement that the trial judge track the language of Witherspoon in examining the jurors with regard to their views on capital punishment.
In substance, Juror Keaton replied that she would have a fixed opinion against imposing the death penalty even if the state proved the appellant guilty as charged in the indictment. Juror Beckham stated that he had a fixed opinion that under no circumstance would he sign any guilty verdict which would require the fixing of the death penalty. Juror Hobart stated that she would have mixed emotions about returning a verdict of guilty if it required the death penalty and even if she found the appellant guilty as charged in the indictment. She further stated that she had mixed emotions about it, that she really did not believe in it and had a fixed opinion against it. Juror Brunson stated that she did not believe she could say kill the appellant if a verdict of guilty required the death penalty. Juror Gunn stated that he had a fixed opinion against returning a verdict of guilty which required the fixing of the death penalty. Thus each juror indicated in one manner or another, by implication if not fact, that they would not return a verdict of guilty if such a verdict required the death penalty.
Finally, in an apparent abundance of caution, the trial judge asked the five jurors as a group if they would have an abiding conviction against assessing a guilty verdict if they were required to return a verdict of guilty which automatically fixed punishment at death.
True, no juror specifically stated or was specifically asked whether he could return a verdict of guilty which required the death penalty in spite of his convictions. However we think the unmistakable import and meaning of each colloquy and the supplemental questioning achieved this same result. Each juror's answers as a whole display an unequivocal reluctance to render a guilty verdict, knowing that the defendant would be subjected to the death penalty. State v. Avery, 286 N.C. 459,212 S.E.2d 142 (1975), vacated in part on other grounds,428 U.S. 904, 96 S.Ct. 3209, 49 L.Ed.2d 1209 (1976).
In reviewing this matter we have not assumed the role of a lexicographer or a technician but have attempted to give the same meaning and substance to the colloquies as would a juror. Certainly, it cannot be said that these five jurors were excluded solely on the basis that they were opposed to the death penalty. If specifically asked, we have no doubt whatsoever that each juror would reply that he could not, in view of his fixed opinion against capital punishment, nevertheless consider the evidence and instructions of the court and return a verdict of guilty although that verdict could result in a death penalty, if he, being the trier of fact, was convinced of the guilt of the accused, and that the facts warranted a sentence of death. For these reasons, it is our conclusion that the trial judge did not err in excusing the five jurors for cause based upon their beliefs regarding capital punishment.
 III
The appellant alleges that the Alabama Death Penalty Statute is an ex post facto law in its application to a defendant whose crime, which constitutes an aggravating circumstance under the statute, occurred before the statute became law. The Alabama statute became effective March 7, 1976. In May of 1969 the appellant was *Page 940 
convicted of murder and given a life sentence.
The well settled weight of authority dictates that a statute providing that the punishment for an offender shall be increased if he has previously been convicted is not an ex post facto law because applied where the previous conviction or convictions took place before its enactment. Gryger v. Burke,334 U.S. 728, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948); Bailey v.State, 211 Ala. 667, 101 So. 546 (1924); and cases cited in 16A C.J.S. Constitutional Law § 450, p. 161 n. 52. Such statutes and other enhanced-sentence laws, including recidivist statutes, have been sustained on several occasions against contentions that they violate constitutional strictures dealing with double jeopardy, ex post facto laws, cruel and unusual punishment, due process, equal protection, and privileges and immunities. Spencer v. State of Texas, 385 U.S. 554,87 S.Ct. 648, 17 L.Ed.2d 606 (1967); Moore v. State of Missouri,159 U.S. 673, 16 S.Ct. 179, 40 L.Ed. 301 (1895); McDonald v.Commonwealth of Massachusetts, 180 U.S. 311, 21 S.Ct. 389,45 L.Ed. 542 (1901); Graham v. State of West Virginia,224 U.S. 616, 32 S.Ct. 583, 56 L.Ed. 917 (1912); Oyler v. Boles,368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962).
Statutes which authorize the infliction of a more severe penalty on one who is a persistent offender
 "do not create or define a new, separate, distinct, independent or substantive offense. Further, the statutes do not inflict additional or further punishment for the commission of the prior offense, or offenses, or impose a new sentence for the prior offense, or operate in any way as punishment [for the prior offense], or affect the punishment inflicted therefor, or serve as a basis for trying accused again for that offense; the punishment is for the new crime only, or for only the last, or latest offense committed." 24B C.J.S. Criminal Law § 1958, pp. 431-433 (citations omitted).
Furthermore, unless provided by statute, in order to authorize the infliction of a more severe penalty on conviction for a second or a subsequent offense, it is not necessary that the first conviction, or other prior convictions relied on, should have occurred subsequent to the enactment of the statute. 24B C.J.S. Criminal Law § 1960 (5)a, p. 465. Unless the statute fixes a maximum time limit within which the prior conviction shall have occurred, the remoteness of that prior conviction is immaterial. 24B C.J.S. Criminal Law § 1960 (5)a, p. 466.
Under the above authorities the trial court was correct in overruling the appellant's demurrer to the indictment presenting these grounds.
 IV
The appellant maintains that since the jury in a capital case is only advisory and the judge must find the aggravating circumstances before sentencing a prisoner to die, there is no logical purpose for the statutory requirement that the indictment allege the prior conviction or that the state be required to present proof of a prior conviction to a jury.
In Alabama, by statute, the aggravating circumstance must be alleged in the indictment where the death penalty is sought. Title 15, § 342 (4), Code of Alabama 1940, Recompiled 1958, 1975 Interim Supplement, now § 13-11-2, Code of Alabama 1975. The aggravating circumstances must be set forth in the indictment because the state is required to give the accused notice that a greater penalty is sought to be inflicted than for a first offense. It is fundamental that the accused must be advised and informed of the nature and extent of the offense with which he is charged.
Under the Death Penalty Statute, the aggravating circumstance is a statutory element of the crime. Without it, one could not be charged and convicted for "capital murder". Though the opinion of the jury is advisory only upon the trial judge (seeJacobs v. State, 361 So.2d 607, at p. 632 (Ala.Cr.App., 1977), the state must prove the aggravating circumstance and the jury must find the existence of such, even *Page 941 
though the enhanced punishment is left to be imposed by the trial judge. By statute,
 "If the jury finds the defendant guilty of one of the aggravated offenses listed in section 13-11-2 and fixes the punishment at death, the court shall thereupon hold a hearing to aid the court to determine whether or not the court will sentence the defendant to death or to life imprisonment without parole." Title 15, § 342 (4), Code, 1975 Interim Supplement, now § 13-11-3, Code 1975. (Emphasis added)
Thus it is clear that the statutory scheme contemplates that the issue of the aggravation of the offense will be submitted to the jury. In the case under review, the state must establish beyond a reasonable doubt (1) the fact of the former conviction of murder in the twenty years preceding the crime (Title 15, § 342 (4)(m), Code, 1975 Interim Supplement, now § 13-11-2 (a)(13) Code 1975) or that the murder conviction carried a life sentence which the defendant was under at the time of the crime (Title 15, § 342 (4)(f), Code, 1975 Interim Supplement, now § 13-11-2 (a)(6), Code 1975) and (2) the fact of the identity of the accused as the person previously convicted.
Additionally, while the aggravated offense must be proved beyond a reasonable doubt, and according to established rules of evidence, the aggravating circumstances which the trial judge must consider need not be admissible under the exclusionary rules of evidence. Title 15, § 342 (5), Code, 1975 Interim Supplement, now § 13-11-3, Code 1975.
In Williams v. State, 239 Ala. 296, 297, 195 So. 213 (1940), the Alabama Supreme Court addressed this same criticism with regard to a death penalty statute (Title 14, § 319, Code of Alabama 1940). Although the jury fixed the punishment in that statute and does not in the present Death Penalty Statute, we think that the comments are applicable in this case.
 "It is further insisted this charge of being a life convict at the time when he is accused of murder in the first degree should not appear in the indictment to go to the jury, nor evidence in support thereof presented to the jury because of bias or prejudice aroused in the minds of the jury. It is suggested this matter should be brought to the attention of the court alone, and if found to be true, the jury be instructed to inflict the death penalty if found guilty of murder in the first degree. This suggestion should be addressed to the Legislature rather than the courts."
 V
The appellant contends that the trial judge erred to a reversal in refusing to grant a pretrial psychiatric examination.
At the hearing on the motion of a psychiatric examination the appellant testified that he understood that he was in court to "stand trial on a murder case"; that "for the past ten or fifteen years, I've had a lot of blackouts, hallucinations, loss of memory — stuff like that"; that he did not recall any of the incidents that involved the murder; that he had never been under medical treatment for any type of mental illness; and that he was thirty-eight years old and had spent twenty-one or twenty-two years in prison.
Cross examination of the appellant revealed that he had escaped from the Georgia State Penitentiary when he was arrested on the present charge; that he had never gone to see a psychiatrist and had not served in the armed forces. No other evidence was presented at the hearing or at trial with regard to the appellant's competency or sanity.
In Robinson v. State, Ala.Cr.App., 337 So.2d 1382 (1976), this court stated:
 "A defendant has no right to receive a mental examination as to his sanity whenever he requests one and, absent such a right, the trial court is the screening agent as to such request. Pace v. State, 284 Ala. 585, 226 So.2d 645."
On a hearing of a motion for a sanity or competency investigation, the defendant has the burden of persuasion.Minniefield v. State, 47 Ala. App. 699, *Page 942 260 So.2d 607 (1972). From the record we are given no cause to doubt the appellant's sanity or competency to stand trial. The trial judge observed his demeanor and manner of testifying and was therefore in a much better position to rule on the motion. We find no abuse of his discretion in denying that motion. Additionally we note that there was no plea of not guilty by reason of insanity filed to the indictment.
 VI
Finally the appellant alleges that the court erred in failing to give the following requested charge when the oral charge of the court did not cover its subject matter and the requested charge was a correct statement of law. The requested charge reads:
Defendant's Requested Charge Number 9.
 "The Court charges the jury that, as a matter of law, that, where a conviction for a criminal offense is sought upon circumstantial evidence alone, the state must not only show by a preponderance of the evidence and beyond a reasonable doubt, that the alleged facts and circumstances are true, but that must be such facts and circumstances as are absolutely incompatible upon any reasonable hypothesis other than that of the guilt of the accused."
In Dutton v. State, 25 Ala. App. 472, 475, 148 So. 876 (1933), this charge was held to be a correct statement of the law citing Everett v. People, 216 Ill. 478, 75 N.E. 188, as the leading supporting authority. However in Mitchell v. State,114 Ala. 1, 22 So. 71 (1896), a charge which instructed the jury that before there can be a conviction on circumstantial evidence,
 "the facts and circumstances must be such as are absolutely incompatible upon any reasonable hypothesis, with the innocence of the accused, and incapable of explanation upon any reasonable hypothesis other than that of the guilt of the accused", (Emphasis added)
was held to be an improper and incorrect statement of the law.
 "The court properly refused to give each of the charges requested by the defendant. They exacted too high a measure of proof, and were calculated to confuse the jury. Dorsey v. State, 110 Ala. 38, 20 So. 450; Buchanan v. State, 109 Ala. 7, 19 So. 410; Webb v. State, 106 Ala. 52, 18 So. 491, and authorities cited. Besides, the true test of the sufficiency of circumstantial evidence to justify a conviction is, whether the circumstances as proved produce a moral conviction to the exclusion of every reasonable doubt. It is not necessary for the circumstances to be `such as are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused'. Bland v. State, 75 Ala. 574; Banks v. State, 72 Ala. 522; Matthews v. State, 55 Ala. 65." Mitchell, supra, 114 Ala. 6, 22 So. 72.
We deem the Mitchell case to be the better reasoned authority and controlling. It contains the correct statement of law,Dutton, to the contrary. To the extent to which the holding inDutton conflicts with our present ruling, it is expressly overruled.
Additionally the refused requested charge was fully, adequately and substantially covered in the other requested charges given by the trial judge. For this reason alone the refusal of the requested charge was not error. Elston v. State,56 Ala. App. 299, 321 So.2d 264 (1975); Hicks v. State,46 Ala. App. 125, 238 So.2d 922 (1970); White v. State, 42 Ala. App. 249, 160 So.2d 496 (1964).
We have searched the record for error and have written to every issue presented by the appellant on the appeal. It is our conclusion that this case is due to be affirmed.
AFFIRMED.
All Judges concur.
[1] This conviction arose from a robbery committed by the appellant after he committed the murder under review. It was on the robbery charge that he was arrested in Decatur, Alabama. This evidence was not presented to the jury.
[2] In Witherspoon, the court stated:
 "We repeat, however, that nothing we say today bears upon the power of a State to exclude a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the time of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to defendant's guilt." *Page 943